# In the United States Court of Federal Claims

No. 16-1265C
(Filed: May 31, 2017)

| | |
|---|---|
| L-3 COMMUNICATIONS INTEGRATED SYSTEMS L.P., <br><br> Plaintiff, <br><br> v. <br><br> THE UNITED STATES OF AMERICA, <br><br> Defendant. | Keywords: Undefinitized Contractual Action; Tucker Act; Contract Disputes Act; Claim; Contracting Officer; Sum Certain; Certification; Subject Matter Jurisdiction. |

*Richard L. Moorhouse*, Greenberg Traurig, LLP, McLean, VA, for Plaintiff. *Jozef S. Przygrodzki*, Greenberg Traurig, LLP, McLean, VA, Of Counsel.

*Jessica R. Toplin*, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, DC, with whom were *L. Misha Preheim*, Assistant Director, *Robert E. Kirschman, Jr.*, Director, and *Chad A. Readler*, Acting Assistant Attorney General, for Defendant.

## OPINION AND ORDER

**KAPLAN, Judge.**

 This is an action brought by Plaintiff L-3 Communications Integrated Systems LP (L-3) pursuant to the Tucker Act and the Contract Disputes Act (CDA). L-3 entered into an "undefinitized contractual action" (UCA) with the United States Air Force, whereby it agreed to begin providing certain training services while L-3 and the Air Force negotiated over the terms of the contract. After the parties failed to reach agreement on the prices for two line items in the UCA, the Air Force issued a unilateral contract modification which set prices for those line items and definitized the contract. In this action, L-3 complains that the Air Force's price determination was unreasonable, arbitrary and capricious, and in violation of applicable provisions of the Federal Acquisition Regulations (FAR). It seeks damages in the amount of $1,030,522 as of July 31, 2016, for losses sustained as a result of the allegedly improper price determination.

 Now pending before the Court is the government's motion to dismiss L-3's complaint for lack of subject matter jurisdiction. The government contends that L-3 failed to submit the claim it brings before this Court to the contracting officer (CO), as required by the CDA. For the

reasons set forth below, the government's motion is **GRANTED** and the complaint is **DISMISSED** without prejudice for lack of subject matter jurisdiction.

**BACKGROUND**[1]

## I.     The UCA

On September 5, 2014, L-3 entered into a foreign military sales contract with the Air Force, in which it agreed to provide certain training services to the Royal Australian Air Force (RAAF) through its Platform Integration Division (PID).[2] See Compl. ¶¶ 8–9, ECF No. 1. The training concerned the operation of a version of the C-27J (a transport aircraft), which had been modified to "meet the special requirements of the U.S. Air Force and [the] RAAF." Id. ¶ 10. Due to urgency in the training requirements for these aircraft, L-3 and the Air Force entered into a UCA, "which allowed L-3 to proceed with contract performance while the contractor and the Air Force negotiated certain terms of the Contract, including the price." Id. ¶ 12.[3]

Among the contract line items (CLINs) for the services L-3 would provide were CLINs X031, for "aircrew Operational Flight Trainer ('OFT') training," and X032, for "Fuselage Trainer training." See id. ¶ 17. L-3 agreed to provide these training modules through the use of a C-27J Simulator. Id. ¶¶ 17–18. It alleges that its "fixed cost investment" in the Simulator totaled $38,000,000. Id. Trainees were to use the C-27J Simulator and the Air Force was to compensate L-3 on a per-hour basis, with separate hourly rates for each operating period of the UCA. Id. ¶ 17.

## II.    Definitization

After entering into the UCA, L-3 and the Air Force began negotiations to definitize its terms. Id. ¶ 22.[4] These negotiations began on December 18, 2014, with L-3's submission of a

---

[1] The facts in this section are based on the documents attached to the parties' briefs as well as the allegations in L-3's complaint, which the Court assumes to be true for purposes of deciding the motion to dismiss.

[2] L-3's PID is an "aerospace systems integration organization specializing in the modernization and maintenance of aircraft of all sizes, and the integration of special-mission systems for military and commercial applications." Compl. ¶ 6.

[3] The Defense Federal Acquisition Regulation Supplement (DFARS), found at 48 C.F.R. § 201.103–253.303, contains regulations on the use of UCAs. According to those regulations, a UCA is "any contract action for which the contract terms, specifications, or price are not agreed upon before performance is begun under the action." DFARS 217.7401(d). Although UCAs for foreign military sales are not subject to DFARS' procedural requirements, the CO must apply the "policy and procedures" of those provisions "to the maximum extent practicable." Id. § 217.7402(a).

[4] Under the regulations, UCAs must "contain definitization schedules." DFARS 217.7404-3. Definitization is "the agreement on, or determination of, contract terms, specifications, and price, which converts the undefinitized contract action to a definitive contract." Id. § 217.7401(b).

2

"qualifying proposal" to the Air Force's CO. Opp'n to Def.'s Mot. to Dismiss (Pl.'s Opp'n) Ex. A at 1, ECF No. 9-1. Part of that qualifying proposal included a "Cost Volume/Proposal for C-27J RAAF Training." Id. at 3. The Cost Volume/Proposal included an executed Form 1411 (Contract Pricing Proposal Cover Sheet) which included prices for each line item. See id. at 10–12. For CLINs X031 and X032, L-3 proposed the following quantities and prices:

| Line Item No. | Description | Quantity | Total Price |
|---|---|---|---|
| 0031 | OFT-Year 1 | 472.5 | $1,590,473 |
| 0032 | FuT-Year 1 | 336 | $1,131,003 |
| 1031 | OFT-Year 2 | 757.1 | $2,547,527 |
| 1032 | FuT-Year 2 | 431.6 | $1,452,269 |
| 2031 | OFT-Year 3 | 1084.7 | $3,648,468 |
| 2032 | FuT-Year 3 | 492.5 | $1,656,560 |
| 3031 | OFT-Year 4 | 600.6 | $2,018,959 |
| 3032 | FuT-Year 4 | 230 | $773,161 |

Id.

The Cost Volume/Proposal contained a paragraph in which L-3 represented that "the proposal reflects [L-3's] estimates and/or actual costs . . . and conforms with the instructions in FAR 15.403-5(b)(1) and Table 15-2." Id. at 8. In the Contract Pricing Proposal Cover Sheet (Form 1411), L-3 further represented that the "proposal [was] submitted in response to the RFP, contract, modification, etc. . . . and reflects [its] best estimates and/or actual costs as of this date and conforms with the instructions in FAR 15.804-6(b)(2), Table 15-2." Id. at 12.

Sometime after the submission of the Cost Volume/Proposal, L-3 and the Air Force reached agreement on all line items except CLINs X031 and X032. See Compl. ¶ 23; see also Pl.'s Opp'n at 1, ECF No. 9. On August 21, 2015, L-3 submitted a proposal in which it suggested an hourly rate of $3,324.36 for both of those CLINs. Compl. ¶ 24; see also Def.'s Mot. to Dismiss (Def.'s Mot.) App. at A6, ECF No. 8-1. In response, the Air Force issued its "Government Objective Position" on September 11, 2015. Compl. ¶ 25; see also Def.'s Mot. App. at A1–17. In that document, the Air Force proposed hourly rates of $1,894.06 for CLIN X031 and $266.84 for CLIN X032, for the first ordering period of the UCA, and hourly rates of

These schedules must provide for definitization by the earlier of a) "[t]he date that is 180 days after issuance of the action (this date may be extended but may not exceed the date that is 180 days after the contractor submits a qualifying proposal)"; or b) "[t]he date on which the amount of funds obligated under the contract action is equal to more than 50 percent of the not-to-exceed price." Id. § 217.7404-3.

$1,964.60 for CLIN X031 and $275 for CLIN X032 for the remaining ordering periods of the UCA. Compl. ¶ 25; Def.'s Mot. App. at A6–11.

On September 15, 2015, L-3 countered the rates set forth in the Government Objective Position. See Compl. ¶ 26. It proposed an hourly rate of $4,870.84 for CLIN X031 and an hourly rate of $1,707 for CLIN X032. See id. The Air Force responded on September 17, 2015, by proposing hourly rates of $2,079.78 and $586.99 for CLINs X031 and X032, respectively, for the first operating period of the contract, and $2,171.68 and $608.16 for the remaining operating periods. Id. ¶ 27. On September 24, 2015, L-3 countered again. Id. ¶ 28. In this proposal, L-3 suggested an hourly rate of $3,793.49 for CLIN X031 and an hourly rate of $1,450.76 for CLIN X032. Id.

A conference call was apparently held between the Air Force and L-3 on September 30, 2015. See Def.'s Mot. App. at A22. During that call, "[i]n an attempt to resolve" what it characterized as "the current negotiation impasse," L-3 agreed to provide additional support for certain aspects of its proposal. Id. Thereafter, on October 8, 2015, L-3 submitted a new proposal, for hourly rates of $3,877.55 for CLIN X031 and $904.76 for CLIN X032. Id.; see also Compl. ¶ 29. L-3 outlined the basis for its hourly rate proposals and closed by stating:

> It is L-3 PID's belief and intent that the information provided herein will substantiate the reasonableness of L-3's proposed prices, and will facilitate the parties coming to a mutual agreement on this issue. We look forward to bringing these negotiations to closure so that we may continue to support our mutual end-customer.

Def.'s Mot. App. at A24.

The Air Force responded to L-3's October 8, 2015 counterproposal by stating that its position had not changed since its September 17, 2015 offer. See Compl. ¶ 30. It also stated that the government intended to either unilaterally or bilaterally definitize the contract no later than October 30, 2015. Id. ¶ 34; see also Def.'s Mot. App. at A48 ("to ensure training is not impacted for our customer, the Government intends to definitize the contract no later than 30 Oct 15 either unilaterally or bilaterally").

The parties held another telephone conference on October 28, 2015, during which there was further discussion of the parties' positions. Def.'s Mot. App. at A51. According to an email sent by the CO to L-3 later that day, the government could not justify any more movement on the prices than had been discussed during the telephone conference. Id. He expressed a hope that the parties would be able to come to an agreement the next morning (October 29, 2015), but noted that if they did not, the government would have "no choice but to definitize the UCA tomorrow either unilaterally or hopefully bilaterally to prevent a break in service." Id.

On October 29, 2015, the Air Force issued Amendment PZ0001 "unilaterally definitizing the UCA." Compl. ¶ 37. In it, the Air Force stated that the amendment was issued in accordance

4

with "DFARS 252.217-7027(c) 'Unilateral.'" Def.'s Mot. App. at A54.[5] The Air Force also wrote in the description portion of the amendment that:

> The purpose of this modification is to unilaterally definitize the Undefinitized Contract Action (UCA), subject to contractor appeal as provided in the Disputes clause, due to the parties not being able to reach an agreement on final price.

Id.

Through the amendment, the Air Force changed the CLIN quantity unit of measurement from hours to months. Compl. ¶ 40. It then set monthly prices for CLINs X031 and X032 of $191,020.41 and $21,683.41, respectively. See Def.'s Mot. App. at A62. This resulted in a total contract price of $1,910,204.10 for CLIN X031, and $216,834.10 for CLIN X032. See Compl. ¶¶ 41, 43.

According to L-3, the disparity in the parties' positions was a result of their differing assumptions about annual "usage capability"—i.e., the number of hours of annual training that L-3 would be able to sell for each of the two training modules. See id. ¶¶ 31–33, 37. The Air Force assumed a capability of 2,000 hours for each program; L-3 assumed a capability of 889 hours for OFT training and 1,208 hours for Fuselage Trainer training. Id. ¶¶ 33, 37. L-3 alleges that "[t]hroughout the negotiations, the Government's offers were built on the materially mistaken assumption that there was a greater demand for use of the C-27J Simulator than actually was the case and effectively discounted L-3 PID's information on that critical point." Id. ¶ 35.

## III.   This Action

Following the Air Force's issuance of Amendment PZ0001, L-3 filed its complaint in this court, on October 4, 2016. ECF No. 1. It asserts that the government mistakenly assumed the C-27J Simulator had the capability to perform 2,000 hours per year and that "there was a greater demand for use of the C-27J Simulator than actually was the case." See id. ¶¶ 32, 35. According to L-3, contrary to initial expectations for "wide[] use" of the C-27J by the United States and its allies, only thirty-one C-27J aircraft have been ordered, which has "limit[ed] the demand for

---

[5] Section 252.217-7027 contains a contract clause that must be included in all UCAs. DFARS 217.7406(b)(1)(i). That provision states that the "Contractor agrees to promptly begin negotiating with the [CO] the terms of a definitive contract." Id. § 252.217-7027(a). It also provides that:

> If agreement on a definitive contract action . . . is not reached by the target date . . . the [CO] may, with the approval of the head of the contracting activity, determine a reasonable price or fee in accordance with Subpart 15.4 and Part 31 of the FAR, subject to Contractor appeal as provided in the Disputes clause.

Id. § 252.217-7027(c).

aircrew training and the number of training hours over which L-3 PID is able to amortize its $38,000,000 fixed C-27J Simulator costs." Id. ¶¶ 19–20. Thus, it asserts, when the Air Force unilaterally definitized the contract, it did so on the basis of "improper 2,000 [hour] annual usage 'capability' calculations." Id. ¶ 37.

According to L-3, the hourly rates and total contract prices for CLINs X031 and X032 contained in the definitized contract "put L-3 PID into a loss position on these CLINs and at the total Contract level." Id. ¶ 38. It states that these costs are "insufficient to allow L-3 PID to amortize L-3 PID's fixed cost for the C-27J Simulator." Id. ¶ 42; see also id. ¶ 44. Further, L-3 asserts it has incurred "actual losses [of] $1,030,522 as of July 2016," and expects "to lose a total of $3,562,999 by the conclusion of the Contract." Id. ¶ 51.

Based upon these allegations, L-3 asserts that the Air Force's "unilateral price determination . . . was arbitrary, capricious, and unreasonable in that it denied L-3 PID a reasonable rate of return on the Simulator CLINS, not covering the cost to perform these line items, let alone provide for a reason[able] profit, in violation of FAR Subpart 15.4." Id. ¶ 56. It seeks relief in the form of a declaration that "the Air Force's unilateral UCA decision [was] unreasonable," and asks that the Court "remand the CO's unilateral UCA decision for further negotiations to reach a reasonable rate that allows L-3 PID a reasonable rate of return, including profit." Id. at 9. It further requests that the Court award it $1,030,522 for its "losses as of July 31, 2016," and any additional losses from that date. Id. at 10.[6]

On January 19, 2017, the government moved to dismiss L-3's complaint pursuant to Rule 12(b)(1) of the Rules of the Court of Federal Claims (RCFC). ECF No. 8. It argues that the Court lacks subject matter jurisdiction because L-3 failed to submit a certified claim to the CO and because the CO has not issued a final decision on any claim by L-3. Id. at 5–8. The Court held oral argument on May 26, 2017. See Order, ECF No. 11.

## DISCUSSION

### I.      Standards for Motions to Dismiss Under RCFC 12(b)(1)

Generally, in deciding a motion to dismiss for lack of subject matter jurisdiction, the court accepts as true all undisputed facts in the pleadings and draws all reasonable inferences in favor of the plaintiff. Trusted Integration, Inc. v. United States, 659 F.3d 1159, 1163 (Fed. Cir. 2011). However, if a movant disputes the basis of the Court's jurisdiction, the allegations in the complaint are not controlling and the Court may review evidence extrinsic to the pleadings. Cedars-Sinai Med. Ctr. v. Watkins, 11 F.3d 1573, 1583–84 (Fed. Cir. 1993). The plaintiff bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence. Brandt v. United States, 710 F.3d 1369, 1373 (Fed. Cir. 2013); see also Reynolds v. Army & Air Force

---

[6] At the oral argument in this case, the Court questioned counsel for L-3 regarding whether the request for a remand is an alternative argument in light of the fact that L-3 is seeking an award of damages for losses sustained. Counsel's response was not entirely clear, but the Court understands L-3 to be primarily seeking damages with the request for a remand as a fallback should the Court conclude that it is unable to itself determine reasonable prices for the two CLINs at issue here.

Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988). If the court does not have subject matter jurisdiction, it must dismiss the claim. RCFC 12(h)(3).

## II.      The Court's Jurisdiction Over Contract Disputes

The Tucker Act grants the United States Court of Federal Claims the power "to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). Further, the Court has "jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section 7104(b)(1) of title 41 [i.e., the CDA], including a dispute concerning termination of a contract, rights in tangible or intangible property, compliance with cost accounting standards, and other nonmonetary disputes on which a decision of the [CO] has been issued under section 6 of that Act." Id. § 1491(a)(2).

The CDA applies to "any express or implied contract . . . made by an executive agency for," among other things, "the procurement of services." 41 U.S.C. § 7102(a). Under the CDA, when a contractor has a claim against the government, the "claim . . . shall be submitted to the [CO] for a decision." Id. § 7103(a)(1). This must be done in writing. Id. § 7103(a)(2). Further, all claims for more than $100,000 must be certified. Id. § 7103(b)(1).

Once a claim is submitted, "[t]he [CO] shall issue a decision in writing." Id. § 7103(d). The CO's written decision "shall state the reasons for the decision reached and shall inform the contractor of the contractor's rights," but "[s]pecific findings of fact are not required." Id. § 7103(e).

A contractor that has received a written decision from a CO on a claim may bring an action directly in the Court of Federal Claims "in lieu of appealing the decision of a [CO] . . . to an agency board." Id. § 7104(b)(1). The contractor must do so within twelve months from "the date of receipt of a [CO]'s decision." Id. § 7104(b)(3).

Compliance with these dispute resolution procedures is a prerequisite to the Court's exercise of jurisdiction over claims covered by the CDA. See England v. The Swanson Grp., Inc., 353 F.3d 1375, 1379 (Fed. Cir. 2004) (observing that "jurisdiction over an appeal of a [CO]'s decision is lacking" unless the claim is first presented to the CO for decision). Thus, for the Court to have subject matter jurisdiction over a CDA dispute, there must be "both a valid claim and a [CO]'s final decision on that claim." M. Maropakis Carpentry, Inc. v. United States, 609 F.3d 1323, 1327 (Fed. Cir. 2010) (citing James M. Ellett Constr. Co. v. United States, 93 F.3d 1537, 1541–42 (Fed. Cir. 1996)).

## III.     The Merits of the Government's Motion to Dismiss

In this case, L-3 contends that it suffered monetary losses because the Air Force imposed arbitrary, capricious, and unreasonable rates for the two CLINs at issue here when it definitized the contract. The government argues that this Court lacks jurisdiction over L-3's complaint because, among other reasons, L-3 never presented a certified claim to the CO for payment of a sum certain to cover the losses it alleges it suffered. Def.'s Mot. at 5–6. The Court agrees.

A "claim" under the CDA is "a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to the contract." See M. Maropakis Carpentry, Inc., 609 F.3d at 1327 (internal quotation omitted); see also Paradigm Learning, Inc. v. United States, 93 Fed. Cl. 465, 472 (2010) (citing FAR 52.233-1(c)); FAR 2.101. The written demand or assertion must be non-routine. See James M. Ellett Constr. Co., 93 F.3d at 1542. Further, a claim under the CDA must contain a "clear and unequivocal statement that gives the [CO] adequate notice of the basis and amount of the claim." Contract Cleaning Maint., Inc. v. United States, 811 F.2d 586, 592 (Fed. Cir. 1987). The contractor is also required to request a final decision from the CO, but the request does not need to be explicit if "what the contractor desires by its submissions is a final decision." M. Maropakis Carpentry, Inc., 609 F.3d at 1327–28 (quotation omitted).

In its brief, L-3 does not clearly identify which of its written communications with the Air Force it relies upon to meet the "claim" requirement. Rather, it observes more generally that, "[i]n its pricing proposals, L-3 PID detailed with great specificity the hourly training rates for CLINS X031 and X032 [that] it believed it was entitled to, and the basis for those cost estimates, including preventive maintenance requirements, labor rationales, and overhead costs." Pl.'s Opp'n at 3–4. Citing the court of appeals' decision in Ellett (which concerned a claim for reimbursement in connection with a termination for convenience), L-3 further asserts that "once the parties' negotiations [regarding the rate for the two CLINs] reached an impasse, the proposals converted to a claim." Id. at 2–3; see also id. at 5 (observing that "[j]ust as with a settlement proposal in a termination for convenience, once an impasse in negotiations occurs, the contracting officer rejects the offer, and issues a unilateral determination, that proposal is converted into a claim"). According to L-3, such an impasse had been reached by October 8, 2015, when it submitted additional information in support of its proposal, as well as a revised counteroffer. See id. at 1.

These contentions lack merit. First, L-3's reliance upon Ellett is misplaced. In that case, the Federal Circuit concluded that a plaintiff's proposal to settle the amount of reimbursement due after a termination for convenience ripened into a CDA claim when the parties reached an impasse in their settlement negotiations. See James M. Ellett Constr. Co., 93 F.3d at 1544. L-3 argues that its price proposals likewise ripened into claims once it allegedly reached an impasse with the Air Force over the proper hourly rates for the two CLINs. But in Ellett, unlike here, the plaintiff's initial settlement proposal possessed the necessary characteristics of a claim—i.e., it was a non-routine written demand or assertion seeking, as a matter of right, the payment of money in a sum certain. See id. at 1542–44. Thus, in Ellett, the writing that converted into a claim after the parties reached impasse was a letter, dated November 17, 1988, "the stated purpose of which was 'to file formal notice of claim pursuant to the Contract Disputes Act of 1978.'" Id. at 1540. In the letter, the plaintiff submitted a claim for a sum certain it sought from the agency ($545,157.19) which consisted of (1) an "equitable adjustment for government-ordered changes" ($136,964.81); (2) reimbursement for "unforeseen and unexpected security costs" that were "not disclosed in the prospectus" ($32,036.50); and (3) lost profits ($376,155.88). See id. at 1540 (internal quotations omitted). More than a year later, after unsuccessful attempts to negotiate a settlement, the plaintiff sent the government a letter referencing its "November 17, 1988 CDA 'claim'" and stating that "unless the 'outstanding

claim' were [sic] resolved satisfactorily within thirty days, it would file suit in the United States Court of Federal Claims." Id. (footnote omitted).

The court concluded that although the plaintiff indicated an interest in negotiating with the government over its November 17, 1988 submission, it "need not strain to conclude that the November 17, 1988 submission, which we have already held was properly certified, met the requirements of a valid, nonroutine claim." Id. at 1546. Thus, the court observed that the termination proposal "[was] without question a written demand pursuant to the CDA; it [sought] a sum certain of $545,157.19 . . . as a matter of right under the Changes clause of the contract." Id. It was therefore appropriate to treat the proposal as a "claim" once the parties' negotiation efforts failed. See id. at 1543–44.

The proposals presented to the Air Force by L-3, in contrast, were not characterized as "claims" by L-3; more importantly, they do not request payment of a sum certain to which L-3 claims entitlement as a matter of right.[7] Instead, L-3's initial December 18, 2014 letter (and its subsequent proposals) was part of continuing negotiation over the terms of the contract—i.e., the rates which would apply to work performed under CLINs X031 and X032. L-3 never presented a claim to the CO seeking a specific amount of money as reimbursement for alleged losses it has suffered as a result of what it claims were unlawful agency rate determinations. Indeed, counsel for L-3 essentially conceded as much during the oral argument in this case.[8]

In any event, even assuming that L-3's price proposals could somehow be characterized as "claims" for monetary relief, those purported claims clearly were not certified. The CDA requires that when a contractor submits a claim against the government for more than $100,000:

> The contractor shall certify that – (A) the claim is made in good faith; (B) the supporting data are accurate and complete to the best of the contractor's knowledge and belief; (C) the amount requested accurately reflects the contract adjustment for which the contractor

---

[7] Although not entirely clear from its brief or presentation at oral argument, L-3's jurisdictional argument is apparently premised entirely on the notion that its pricing proposals constituted written demands for the payment of a sum certain, as opposed to claims seeking "adjustment or interpretation of contract terms, or other relief arising under or relating to the contract." To the extent that L-3 is making the latter argument, such argument is unpersuasive. See Bell Helicopter Textron, ASBCA No. 35950, 88-2 BCA ¶ 20656 (rejecting argument that definitization of contract involved adjustment or interpretation of contract terms, and observing that "the contracting officer's action was the initial establishment of the contract price" and that he "was merely performing the duty prescribed by the contract when the parties failed to reach agreement on a price").

[8] Counsel suggested that it would not have been possible for L-3 to provide a sum certain representing its losses because those losses were continuing to accrue as it continued to perform on the contract. Oral Argument at 10:17:51. But the fact that the losses would continue to accrue does not relieve L-3 of its obligation to provide a certified claim regarding its losses to date. See K-Con Bldg. Sys., Inc. v. United States, 778 F.3d 1000, 1005–06 (Fed. Cir. 2015); Tecom, Inc. v. United States, 732 F.2d 935, 936–38 (Fed. Cir. 1984).

believes the Federal Government is liable; and (D) the certifier is
authorized to certify the claim on behalf of the contractor.

41 U.S.C. § 7103(b)(1).

The statements L-3 identifies as constituting its "certification" (which are contained in its
December 2014 proposal and October 8, 2015 letter, see Pl.'s Opp'n at 5–7) manifestly do not
meet these statutory requirements. Thus, in its December 2014 initial proposal letter, L-3 stated
only that its proposed contract terms "reflect[ed its] estimates and/or actual costs . . . and
conform[ed] with the instructions in FAR 15.403-5(b)(1) and Table 15-2." Pl.'s Opp'n Ex. A at
8. Its proposal also included Form 1411, which contained standard language that similarly stated
that the pricing proposal "reflect[ed] [its] best estimates and/or actual costs . . . and conform[ed]
with the instructions in FAR 15.804-6(b)(2), Table 15-2." Id. at 10–12. As the court recognized
in Scan-Tech Sec., L.P. v. United States, 46 Fed. Cl. 326, 336 (2000), the Form 1411 language
that L-3 quotes does not "remotely correspond[] to that of the CDA." That is, it is not an
affirmative statement by L-3 that it was making a claim in good faith, that its supporting data
were accurate and complete to the best of its knowledge and belief, that the amount requested
accurately reflected what it believed to be the government's liability, or that the person signing
the documents was authorized to certify the same on L-3's behalf. Instead, the December 2014
letter merely states that the proposal reflected "estimates" or "best estimates and/or actual costs."
Moreover, FAR 15.403-5(b)(1) and (b)(2), as well as FAR 15.804-6(b)(2), Table 15-2, to which
the letter and Form 1411 refer, address the format for the submission of certified cost or pricing
data in response to a solicitation and do not contain any claim certification language.

Similarly, in its October 8, 2015 letter, L-3 stated that it was its "belief and intent that the
information provided [t]herein [would] substantiate the reasonableness of L-3's proposed
prices." Def.'s Mot. App. at A24. This language also bears no resemblance to a CDA
certification. In that regard, it is important to keep in mind that the purpose of the certification
requirement is to "trigger a contractor's potential liability for a fraudulent claim." United States
v. Grumman Aerospace Corp., 927 F.2d 575, 579 (Fed. Cir. 1991) (quoting Ball, Ball &
Brosamer, Inc. v. United States, 878 F.2d 1426, 1429 (Fed. Cir. 1989)) (internal alteration
omitted). L-3's statements regarding its "beliefs," "intent," or "best estimates" do not constitute
the kind of binding language which might give rise to potential liability for fraudulent claims.

To the extent that L-3 argues that the language upon which it relies was merely
"defective" and so does not deprive the court of jurisdiction, Pl.'s Opp'n at 5–7 (citing, inter alia,
41 U.S.C. § 7103(b)(3) and Fischbach & Moore Int'l Corp. v. Christopher, 987 F.2d 759, 763
(Fed. Cir. 1993)), that argument lacks merit. A defective certification is one "which alters or
otherwise deviates from the language . . . or which is not executed by a person authorized to bind
the contractor." 48 C.F.R. § 33.201. To qualify as a defective certification, however, the
certification attempt must "at least resemble the statutory language." CSX Transp., Inc. v. United
States, 123 Fed. Cl. 244, 252 (2015) (internal quotation omitted). "Failure to certify shall not be
deemed to be a defective certification." FAR 33.201; see also Medina Constr., Ltd. v. United
States, 43 Fed. Cl. 537, 547 (1999) ("A complete failure to provide a certification at all may not
be deemed a defective certification."); Pevar Co. v. United States, 32 Fed. Cl. 822, 825 (1995)
("[A] contractor must make some attempt to certify its claim before filing suit in this court."
(citation omitted)).

As set forth above, nothing in the language upon which L-3 relies remotely resembles the certification requirements. Best estimates or affirmations of a belief in a proposal's reasonableness do not equate to certifications of accuracy. L-3's proposals also completely omit any assertion that the signer has authority to certify a claim on L-3's behalf.

For these reasons, the Court concludes that L-3 failed to submit a valid, certified claim to the CO prior to filing its complaint in this court. The Court, accordingly, lacks jurisdiction over L-3's complaint. [9]

## CONCLUSION

For the reasons set forth above, the government's motion to dismiss is **GRANTED** and the complaint is **DISMISSED** without prejudice. The Clerk is directed to enter judgment accordingly. Each party shall bear its own costs.

**IT IS SO ORDERED.**

s/ Elaine D. Kaplan
ELAINE D. KAPLAN
Judge

---

[9] Because the Court concludes that L-3 failed to submit a valid, certified claim, it is not necessary to address the government's further argument regarding whether the contract modification represented the CO's final decision on any such claim.